1997 SD 101

**SUN MORTGAGE CORPORATION,**
Plaintiff and Appellant,

v.

**WESTERN WARNER OILS LTD.,** Keith Peterson and Carol Peterson, Don Benson, Edward D. Jones & Co., Super 8 Motels, Inc., and Canadian Cartel Projects, Inc., Defendants and Appellees.

No. 19855.

Supreme Court of South Dakota.

Argued April 30, 1997.

Decided Aug. 6, 1997.

Robert M. Ronayne and Dawn M. Aman of Ronayne and Wein, Aberdeen, for Plaintiff and Appellant.

Haven L. Stuck and Craig A. Pfeifle of Lynn, Jackson, Shultz & Lebrun, Rapid City, for Defendant and Appellee Edward D. Jones & Co.

AMUNDSON, Justice.

[¶ 1.] Sun Mortgage Corp. (Sun Mortgage) sued Western Warner, Oils, Ltd. (Western Warner) and others for breach of contract. Partial summary judgment was granted to

Sun Mortgage against Keith and Carol Peterson (Petersons). The remaining issues before the trial court consisted of Sun Mortgage's claim against Edward D. Jones & Co. (EDJ) for violating the hypothecation agreement, and EDJ's cross claims against Petersons, primarily for indemnification. After a court trial, judgment was entered in favor of EDJ and Petersons. From this judgment, Sun Mortgage appeals. We affirm.

## FACTS AND PROCEDURAL HISTORY

[¶ 2.] In April of 1989, Kale Kanale, Inc. (Kale) made a loan to Canadian Cartel Projects (Cartel), which was guaranteed by Don Benson (Benson) and Petersons. Petersons pledged as collateral certain securities which were held in a "street name" account (Account X) at EDJ. Richard Shead (Shead), a member of the law firm of Buchwald Asper & Henteleff (BAH), represented Cartel in this loan transaction and agreed to be the escrow agent.

[¶ 3.] On November 15, 1989, Sun Mortgage made a loan to Western Warner which was also guaranteed by Benson and Petersons. In the hypothecation agreement,[1] Petersons pledged a Super 8 Motel debenture and certain securities held in Account X. At least one of these securities was previously pledged as collateral on the Kale–Cartel transaction. The hypothecation agreement also contained an acknowledgment signed by Marvin Tebben (Tebben), an EDJ agent, which states, in pertinent part:

> EDWARD D. JONES & CO. acknowledges that no instructions to sell, liquidate, margin, encumber, charge or otherwise deal with the Securities will be accepted by it without the prior written consent of the Lender, its trustee or trustees, nominee or nominees, assign or assigns or any purchaser from the Lender.

Tebben, who signed this agreement, testified that he was unaware of this acknowledgment. He further testified he would not have signed the agreement had he known of the acknowledgment's existence, as he was not authorized to bind EDJ in such a manner.

1. Hypothecation agreement is defined as an agreement to "pledge property 'as security or

[¶ 4.] Shead represented Western Warner, while T.G. Frohlinger (Frohlinger), also a member of the BAH firm, represented Sun Mortgage in this transaction. The BAH firm also agreed to act as escrow agent. BAH's office manager, R.C. Hunter, was the president and a stockholder of Sun Mortgage. The primary shareholder in Sun Mortgage was Manitoba Ltd., a holding company of which Frohlinger was the sole director. In addition to these connections, Sun Mortgage's corporate offices were contained in BAH's facility. Due to these numerous conflicts of interest, a special agreement was drafted by BAH and signed by the parties, which stated:

> There shall be no solicitor/client privilege with respect to any information which is made known to us [BAH] by any of you with respect to this transaction and we are therefore free to communicate this information to any of you on a need-to-know basis.

[¶ 5.] On July 6, 1990, the parties entered into an extension of the Kale–Cartel loan. Subsequently, two securities were transferred by Petersons through EDJ from Account X to an account in the name of Keith Peterson (Account Y). One of these securities was the same as that listed as collateral in the Sun Mortgage–Western Warner hypothecation agreement.

[¶ 6.] On September 21, 1990, EDJ's main office was informed of the alleged agreement between Tebben and the parties to the Kale–Cartel loan. Shead sent a letter to EDJ referring to "the security held by your firm on account of Kale–Kanale" and requesting an explanation of the previously mentioned transfers from Account X to Account Y. In response to this letter, EDJ's lawyer wrote, in part:

> [P]lease be advised that Edward D. Jones & Co. does not agree to or acknowledge itself to be bound by any pledge, assignment, security interest, or collateralization agreement which may exist between Mr. Peterson and your client, Kale–Kanale, Inc. The account for which your firm is to receive duplicate statements [per Mr. Pe-

collateral for a debt." *Black's Law Dictionary* 742 (6thEd 1990).

terson's request] is owned on our books by Keith A. Peterson. The securities held by Edward D. Jones & Co. in that account are held for the benefit of Mr. Peterson only. Edward D. Jones & Co. has not committed itself to and is not bound to protect any interest which your client believes it may have in either the account or the securities.

[¶ 7.] Shead responded by informing EDJ it was bound to protect his client's interest. He also put EDJ on notice that disposal of the assets or income of "that account" would render EDJ liable to Kale. EDJ's counsel again responded by stating none of the individuals located at the branch office of EDJ had authority to bind EDJ in such a manner.

[¶ 8.] The Sun Mortgage–Western Warner loan was in default during the last half of 1990. Frohlinger then advised Shead (who, again, represented Western Warner) Sun Mortgage would be willing to extend the loan until June 15, 1991, under certain circumstances. No notice of this extension was given to EDJ.

[¶ 9.] In January of 1991, Petersons, acting upon the suggestion of Shead, began liquidating the securities in Accounts X and Y.[2] BAH received a copy of the statement covering January 1–21, 1991, which indicated securities pledged to both Kale and Sun Mortgage had been liquidated. No objection was made at that time by Sun Mortgage or BAH. EDJ paid Petersons directly without any further direction.

[¶ 10.] Subsequently, Sun Mortgage acquired the services of lawyer Gordon Pullan, who requested EDJ give an accounting of the securities held in Account Y. No such accounting was forthcoming. Sun Mortgage, with the assistance of lawyer Dennis Monroe, then sued Western Warner, Petersons, Benson, EDJ, Super 8 Motels, and Cartel for breach of contract on May 11, 1993. EDJ denied the claim and filed a cross-claim against Western Warner, Petersons, Benson, and Cartel. Petersons denied the claim; Super 8 Motels denied the claim and filed a cross claim against Western Warner, Petersons, Benson, Cartel, and EDJ. The cross

claims against Western Warner, Bensons, and Cartel were dismissed due to lack of personal jurisdiction.

[¶ 11.] Partial summary judgment was granted to Sun Mortgage against Petersons in the sum of $170,000. Sun Mortgage also settled its claim against Super 8 Motels and Petersons, agreeing not to execute upon the judgment against Petersons or further proceed against Super 8 Motels. Super 8 was then dismissed from the proceeding.

[¶ 12.] The remaining issues were Sun Mortgage's claim against EDJ for violating the hypothecation agreement and EDJ's cross claims against Petersons, primarily for indemnification. After a court trial, judgment was entered in favor of EDJ and Petersons. From this judgment, Sun Mortgage appeals, raising the following issues:

I. Whether Sun Mortgage had a duty to mitigate its damages.

II. Whether Sun Mortgage undertook reasonable efforts to mitigate its damages.

III. Whether the trial court erred in concluding that South Dakota legal ethical standards should apply to a business and loan transaction occurring in Canada.

## STANDARD OF REVIEW

[¶ 13.] The trial court's findings of fact are reviewed under a clearly erroneous standard, meaning the "findings will not be disturbed unless the court is 'firmly and definitely convinced a mistake has been made.'" *City of Colton v. Schwebach,* 1997 SD 4, ¶ 8, 557 N.W.2d 769, 771 (quoting *Jasper v. Smith,* 540 N.W.2d 399, 401 (S.D.1995)). However, conclusions of law are reviewed de novo, with no deference given to the trial court's conclusions. *Id.* Mixed questions of fact and law are also reviewed de novo.

## DECISION

[¶ 14.] I. **Duty to Mitigate.**

■ [¶ 15.] The trial court concluded as a matter of law that Frohlinger had notice via

---

2. The record reflects Shead did not instruct the Petersons to liquidate the securities, but he informed them that Petersons securities were pledged and "it would be appropriate to dispose of them."

letter to his partner Shead of EDJ's disavowing an obligation to protect a third party's (Sun Mortgage's) interest in the account. The trial court found Sun Mortgage's duty to mitigate its damages was activated upon receipt of this letter. Sun Mortgage claims this is error because the rights and obligations were governed by the commitment letter and hypothecation agreement stating Sun Mortgage was not bound to realize the securities that were pledged.

[¶ 16.] The doctrine of avoidable consequences states that a "party cannot recover damages flowing from consequences which that party could reasonably have avoided." 22 AmJur2d *Damages* § 495, at 579 (1988); *see also Restatement (Second) of Contracts* § 350(1), at 126 (1979) (stating, "damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation."). This doctrine is generally applicable to the determination of damages in causes of action involving breach of contract. *Id.* § 505. *See, e.g., Ducheneaux v. Miller*, 488 N.W.2d 902, 917 (S.D. 1992), stating law " 'imposes upon a party injured from another's breach of contract or tort the active duty of making reasonable exertion to render the injury as light as possible.' " (Quoting *Gardner v. Welch*, 21 S.D. 151, 110 N.W. 110, 112–13 (1906)). *See also Assam v. Hauk*, 345 N.W.2d 384, 385 (S.D.1984), stating the party "was required to exercise ordinary care to minimize existing damages and to prevent future damages." (Citing *Nicola v. Meisner*, 84 N.W.2d 702 (N.D.1957)).

[¶ 17.] The sole case cited by Sun Mortgage in support of its argument is *Universal Inv. Co. v. Sahara Motor Inn, Inc.*, 127 Ariz. 213, 619 P.2d 485 (Ct.App.1980). However, this case involved a suit on a note by the seller against the buyer after default. *Id.* 619 P.2d at 486. The buyer responded by claiming the seller failed to mitigate damages. *Id.* at 487. The court ultimately determined the doctrine of avoidable consequences was inapplicable because the note entered into between the parties evidenced

an "absolute promise to pay." *Id.* In the case at hand, the note holder, Western Warner, did not raise the issue of mitigating damages. Further, EDJ, who is claiming the damages should have been minimized, never made an absolute promise to pay Sun Mortgage anything. *Universal Inv. Co.* is therefore inapposite.

[¶ 18.] After distinguishing Sun Mortgage's only supporting case, and pursuant to *Ducheneaux*, 488 N.W.2d at 917, and *Assam*, 345 N.W.2d at 385, we hold the trial court did not err in concluding Sun Mortgage had a duty to mitigate damages under the facts presented in this case.

[¶ 19.] **II.  Reasonable Efforts to Mitigate.**

■ [¶ 20.] The trial court found, "Notice of [EDJ's] position to Mr. Shead, as BAH's agent, was notice to BAH and to each partner in BAH, including T.G. Frohlinger, Sun's legal counsel and primary shareholder." Based upon this notice, the trial court concluded Sun Mortgage possessed the knowledge that EDJ took the position it was not bound by the hypothecation agreement. Further, Sun Mortgage failed to protect its interests by commencing an appropriate action to restrain or enjoin any activity in Petersons' account.

[¶ 21.] Sun Mortgage argues a dual agency in which an agent acted for two parties to a similar transaction did not exist; rather, there was a dual agency in which the agent (Shead) acted for two different principals (Cartel and Western Warner) and two different loan transactions. Thus, Sun Mortgage contends Shead's knowledge concerning the Kale loan should not be imputable notice to Frohlinger, because Shead is not associated with Sun Mortgage.

[¶ 22.] Although Sun Mortgage contends agency principles apply to this case, statutory authority clearly governs this action, as it relates to imputed notice to other partners of a firm.[3] SDCL 48–2–5 states:

---

**3.** It is noted that BAH, a firm of at least 36 lawyers, is presumed to be a partnership, as there is no indication of incorporation. The fol-

lowing testimony by Frohlinger supports this conclusion (emphasis added):

Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner.

It is clear Shead received sufficient notice under SDCL 48–1–10(2), which requires a "written statement of a fact" to be delivered to the appropriate person.[4] Shead received letters from EDJ stating it was not bound to protect any claimed interest of Shead's client in the account or securities. Further, the matter relates to partnership affairs as the information contained in the letter involved the rights of the client of Shead, a partner in the law firm.

█ [¶ 23.] According to SDCL 48–2–5, once Shead received such notice, it was imputed to Frohlinger. The statute states that knowledge one partner gains which "reasonably could and should [be] communicated" to another partner constitutes imputed knowledge to the partnership. Generally, "the knowledge is imputed ... if the knowledgeable partner has reason to know of the pertinence of the information to partnership affairs at the time of acquiring it and so should understand the need to act on the information or communicate it to the other partners." Alan R. Bromberg & Larry E. Ribstein, *Partnership* § 4.06(c) (1996). This is true even when the information is received in a nonpartnership transaction if the partner is aware of the relevance of the information. *Id.*

[¶ 24.] A Superior Court of New Jersey addressed this issue in *Affiliated FM. Ins. Co. v. Kushner Cos.*, 265 N.J.Super. 454, 627 A.2d 710, 716–17 (L.1993), involving knowledge of fire loss by a partner imputed to the partnership, thereby creating constructive knowledge of the loss. The court stated that "[k]nowledge by one partner with respect to any matter relating to a transaction within the ordinary scope of the partnership business is knowledge to all partners." *Id.* at 716. The court further held the knowledgeable partner should have informed another partner who was "implicitly involved in the process" of applying for fire insurance. *Id.* at 717. Had the knowledgeable partner so informed the other partner, the lawsuit would have been avoided. *Id.* at 718. *See also Allen Chase & Co. v. White, Weld & Co.*, 311 F.Supp. 1253, 1258 (S.D.N.Y.1970) (stating one partner could be entitled to recover on account of the merger entered into by another partner because the knowledge of one partner is imputed to the partnership); *State ex rel. Moore v. Scroggie*, 109 Idaho 32, 704 P.2d 364, 370–71 (App.1985) (holding knowledge of first attorney regarding equitable interest of wife in proceeds from property was imputable to second attorney in the same firm who represented husband in a criminal trial).

[¶ 25.] In this case, the knowledge obtained by Shead, who obviously wore many hats in this transaction, via letter from EDJ's lawyer could reasonably have been communicated to Frohlinger, the partner who was involved in the transaction and was affected by the information. Shead obtained the information regarding Tebben's inability to bind EDJ to protect any of Cartel's interests while representing Cartel and acting as an escrow agent. Shead, a partner of BAH, was aware Frohlinger, a co-partner, was the primary stockholder in Sun Mortgage and represented Sun

---

COUNSEL: And D.G. Ward, does that refer to Doug Ward, a present or former Buchwald Asper attorney?
FROHLINGER: He's a present *partner* of mine.

&ast; &ast; &ast; &ast; &ast; &ast;

COUNSEL: Ogaranko?
FROHLINGER: He's a *partner* of Buchwald Asper.

4. The full text of this statute reads:

A person has "notice" of a fact within the meaning of chapters 48–1 to 48–5, inclusive, when the person who claims benefit of the notice:
(1) States the fact to such person; or
(2) Delivers through the mail, or by any other means of communication, a written statement of the fact to such person or to a proper person at his place of business or residence.

Mortgage in a legal capacity. In addition, Sun Mortgage was owned and operated by the majority of the partners in the BAH firm and was housed in BAH's office space. As the trial court stated, "To say that T.G. Frohlinger had notice of Edward D. Jones' disavowal of any obligation as a partner in BAH, but did not have the same knowledge as the primary shareholder in Sun Mortgage and/or as Sun's legal representative is to bypass reality in favor of legal fiction[.]" We agree, and hold the trial court did not err in such a determination.

■ [¶ 26.] We then address whether Sun Mortgage, having possessed the knowledge that EDJ claimed to not be bound to protect any third party's interests, failed to mitigate its damages. It is settled in South Dakota that "[t]he breaching party has the burden of proving damages would have been lessened by the exercise of reasonable diligence on the part of the non-breaching party." *Ducheneaux*, 488 N.W.2d at 918. The trial court concluded the failure to mitigate damages was adequately proven and "[a]ll damages alleged by Sun were avoidable through the exercise of reasonable diligence and since Sun chose to ignore its duty to mitigate damages, Sun is not entitled to monetary damages from Edward D. Jones."

[¶ 27.] Reasonable diligence has been described as acting "with such care and diligence as a person of ordinary prudence would under the circumstances," applying "rules of common sense, good faith, and fair dealing." 22 AmJur2d *Damages* § 498, at 583; *see also Restatement (Second) of Contracts* § 350 cmt b, at 127 (stating a party is "expected to take such affirmative steps as are appropriate in the circumstances to avoid loss[.]"). The trial court determined that reasonable diligence was not undertaken by Sun Mortgage to protect its interests. The evidence discloses Sun Mortgage could have protected its interest in the following fashion: transferring securities from a "street name" account to Petersons individually; placing Sun Mortgage's interests on the certificates; perfecting any claimed interest in the securities (as allowed by the hypothecation agreement); objecting to the account transfers or liquidations; or attempting to seize the proceeds Petersons collected from the sales.

[¶ 28.] Based on the record in this case, the trial court found Sun Mortgage failed to take any action to mitigate its damages. We hold the trial court did not err in such a finding.

[¶ 29.] We considered the final issue in this case and find it without merit. We affirm.

[¶ 30.] MILLER, C.J., and SABERS, KONENKAMP and GILBERTSON, JJ., concur.